MICHEL *et al., Appellants*, v. TINSLEY.

1. **Affirmed on the Facts.** This being a suit in equity to divest title out of the defendants and vest it in plaintiffs, on the ground that it was obtained by defendants through fraud and breach of trust, the court examines the evidence and affirms the judgment of the lower court in favor of defendants.

2. **Reformation of Deeds for Mistake on their Face.** The court can reform a deed where there are mistakes apparent upon the face of the instrument, without parol testimony to prove the

mistake, as for instance, where the seal is omitted, though the deed purports to be under seal, or where there is no granting clause, although there are words of warranty.

3. **Statute of Limitations.** A party not in the possession of land cannot invoke the statute of limitations to prevent the correction of errors in a deed under which the possessor claims title.

*Appeal from New Madrid Circuit Court.*—HON. D. L. HAWK-INS, Judge.

*Waters & Winslow* with *S. T. Davis* for appellants.

The court below erred in reforming the trustee's deed from Hunter to Tinsley. It had no seal, and no words of conveyance. It was in fact a simple memorandum of the sale. As a contract to convey or a conveyance, it had no validity, and was not a proper instrument for reformation. 1. The mistake complained of was the result of pure carelessness, and against such mistakes equity affords no relief. *Graham v. Berryman,* 19 N. J. Eq. 29; *Dillett v. Kemble,* 25 N. J. Eq. 66; *Voorhis v. Murphy,* 26 N. J. Eq. 434. 2. The deed is not such an instrument as equity will reform. It was made in execution of a naked legal power. There was and could have been, no pre-existing contract to be reformed, as the trustee could only follow strictly the terms of the deed appointing him. The trustee is the custodian of a naked legal power; and the particular mistakes complained of here consist of the omission of certain statutory requisites of a valid deed. Equity will not aid the defective execution of mere legal powers, or where the policy of legislation supervenes. Besides, conflicting equities, growing out of the transaction, have become involved, and equity cannot consistently interfere. 1 Story Eq. Jur., (12 Ed.) §§ 95, 96, 176, 178; *Moreau v. Detchmendy,* 18 Mo. 522; *Speck v. Wohlien,* 22 Mo. 310; *Moreau v. Branham,* 27 Mo. 351; *Schwickerath v. Cooksey,* 53 Mo. 75; *Shroyer v. Nickell,* 55 Mo. 264; *Houx v. Bates Co.,* 61 Mo. 391; *Bright v. Boyd,* 1 Story (U. S.) 478; *Gibb v. Rose,* 40 Md. 387; *Dickinson v. Glenney,* 27 Conn. 104. 3. As to the granting

words, whether they shall be words of quit-claim or warranty, or to what extent they shall go, nothing short of the kind and quantity of evidence required to establish trusts, mortgages, and the like, by parol, will be sufficient. There is simply no evidence in the record on this subject. To secure such relief, the contract must be certain, mutual, lawful, untainted with fraud, and in every way capable of performance; and the evidence must be clear, convincing, unequivocal, to show the existence of the mistake and its precise character; which implies the ability to show the exact language the parties intended to use. Every presumption is in favor of the instrument as it is; and the mere fact that something is necessary to make it effectual will not justify its reformation without evidence. *State ex rel. v. Frank*, 51 Mo. 98; *Schwickerath v. Cooksey*, 53 Mo. 75; *Mastin v. Halley*, 61 Mo. 196. For aught that appears in the record, Hunter may have used the identical words he intended, and may have been mistaken as to their legal effect only. If so, the court had no power to correct it. *Moorman v. Collier*, 32 Iowa 138; *Jacobs v. Morange*, 47 N. Y. 57. The right to have the mistake corrected was barred by the statute of limitations. The mistake here, if any, was palpable on the face of the deed, and the natural presumption is that it was discovered within a reasonable time. *Hunter v. Hunter*, 50 Mo. 445.

*Hockaday & Silver and Louis Houck* for respondents.

1. The power contained in the deed was not a statutory one, but was the private power of the grantor in the deed of trust, and, hence, its defective execution could be corrected. *Beatie v. Butler*, 21 Mo. 319; 2 Perry on Trusts, § 602 g. 2. Nor did the statute of limitations bar the correction. *Varick v. Edwards*, 11 Paige 290; *Bartlett v. Judd*, 23 Barb. 263; *Love v. Watkins*, 40 Cal. 547. The evidence of mistake was sufficient to authorize the correction. The omission of the seal by mistake is apparent from

the words "under my hand and seal," in the conclusion of the deed. *Mastin v. Halley*, 61 Mo. 199; *Wadsworth v. Wendell*, 5 John. Ch. 224. So the omission of operative words of grant is equally apparent from the clause of covenant and warranty.

NAPTON, J.—This is a proceeding in equity to establish the title of plaintiffs to eight or nine hundred acres of land in Pemiscot county, alleged to have been divested from plaintiffs' ancestor by fraud and breach of trust. The suit was instituted on the 10th day of August, 1869, the pleadings and testimony are voluminous, most of the transactions upon which the finding and decree of the court are based, occurred years ago, extending from 1837 down to within a year or two before the institution of the suit, and it is, therefore, necessary to determine whether the finding of the court upon which the bill was dismissed, and upon which, what is here called the cross-bill was sustained, was justified by the testimony, and whether the decree was authorized by the finding. It would not subserve any useful purpose, however, to give a detailed statement of the evidence in the case. There are some facts undisputed, and these need only to be rehearsed; there are others about which the evidence is contradictory, and concerning them we will merely state the character of the evidence adduced on either side, and the inferences to be drawn from such testimony, taken in connection with undisputed facts.

It appears from the record that Arthur F. Eastwood, one of the sons of James Eastwood, entered part of the land in controversy at the Jackson land office, in 1837, in his own name, and secured the patent from the Government in due time. He was then a minor about eighteen years old. He was a brother of William J. Eastwood, who was younger than he, in whose name the remaining forty acres of the land was entered. The plaintiffs were the three children of Arthur

1. AFFIRMED ON THE FACTS.

F. Eastwood and his heirs and the heirs of his brother,
William J., both of whom were dead long before the com-
mencement of the suit in 1869, Arthur having died in 1850,
and the exact date of the death of his brother, which oc-
curred afterwards, not appearing from the record.    It
appears that in 1844, and previous to that time, and proba-
bly before the removal of the father, James Eastwood, from
Tennessee, over the river into that part of New Madrid
now called Pemiscot, the old man was embarrassed by
debts, though holding a large quantity of land.    However
that may be, he and his two sons, Arthur and William,
being in that year indebted to Robert G. Watson, and Wat-
ers & Allen, of New Madrid, to the amount of about $3,000,
the father and the two sons, with their wives, executed a
deed of trust to W. W. Hunter, conveying the land now
in dispute, and a variety of personal property, consisting
mostly of stock and some household furniture, and some
slaves, to secure this indebtedness.    These lands, though
of inexhaustible fertility, and above the reach of high
water, and heavily timbered, were not probably at that day
(1844) worth in the market over $3 or $4 an acre.    To
make them valuable the timber had to be removed.    The
trustee was authorized by this deed, in the event that the
indebtedness recited in it was not paid on January 1st,
1847, to advertise by nine hand-bills put up in the most
public places in said county, sufficient of said property to
pay said debts and costs, and he was required to sell said
property to the highest bidder, unless otherwise agreed
upon by the parties on the day of sale.

There is considerable diversity of opinion in the state-
ments of witnesses as to what occurred at the sale, which
took place in 1852, and after the death of Arthur F., one
of the grantors.    The trustee, Hunter, was dead before the
trial, and so was the father, James Eastwood, and both
the sons.    His two sons-in-law, Nall and Tinsley, were,
however, examined, and they were obviously the most re-
liable witnesses, as they had every opportunity of knowing

the facts, and so far as can be perceived, no motive to misrepresent them. From their testimony, as well as that of Mrs. Eastwood, the wife of James Eastwood, and the intrinsic probabilities of the case, it appears clear that the old man had advanced the money to enter these lands, and was the real owner of them, and had always been so regarded by his sons and sons-in-law, and by all the family, and exercised over them the control which devolved on an owner. There is undoubtedly a mass of testimony which seeks to contradict this conclusion, but it comes chiefly from persons who were not in a situation to know the facts. The account given by Tinsley and Nall, which we consider more reliable, makes it plain that James Eastwood was anxious to prevent a sacrifice of the land, and, therefore, in 1852, by consent of his creditors, it was agreed to be conveyed to Dr. Tinsley, who was subsequently to make such sales as James Eastwood should direct. At the sale the bids for the land were made by Tinsley and Nall, and Michel and James Eastwood, all members of the family, but the understanding was that the whole should be conveyed to Tinsley, and it was so done, or attempted to be done. The charge of fraud and conspiracy in the sale is made in the bill, and it is a part of the basis upon which the decree of the circuit court is sought to be reversed. This charge is based on the sole fact that Hunter, the trustee, conveyed all the land to Tinsley, and not to the five highest bidders. That such an arrangement was made before the sale and subsequently carried out is conceded, but the question whether it was fraudulent or not, is another matter, and the answer to it depends on all the facts appearing in the case. There were five bidders at the sale, but by an agreement between them, it was understood that the title should be conveyed to one. The notes given by those bidders were satisfactory to the creditors, and they all concurred in requesting the trustee to make the deed to Tinsley. The land was duly advertised and put up to the highest bidder, but those bidders were friends and relatives

of the owner and agreed that the title should be made to Tinsley. Tinsley's contract in regard to his duties was reduced to writing. It was simply to convey as the old man should direct, and after paying the debt to follow his directions. There is no charge that Tinsley did not faithfully carry out his agreement. The death of Arthur Eastwood did not extinguish or suspend the power of sale, (*Benkie v. Buller*, 21 Mo. 313,) and the whole object and effect of the arrangement denounced as fraudulent, was to put the legal title in one, in whom all parties, the owners, the creditors and the trustee had implicit confidence, and whose subsequent acts proved that such confidence was not misplaced. We are not apprised of any rule of equity which prohibits such an agreement. The legal title of Arthur Eastwood had been conveyed to Hunter, and James Eastwood, the father, conscious as he was of being the equitable owner, joined in the conveyance, and the creditors consented to the conveyance to Tinsley. In a word, it is our conclusion from all the evidence, that the family of Eastwood were entirely harmonious, and that during the lives of the father and sons no controversy arose—that the sons, as was natural, looked up to the father as the controlling manager of such lands as were acquired with the father's money whatever shape the legal title assumed, and admitted, on all occasions, to such persons as had any right to inquire, that their father actually advanced the money to buy the lands now in dispute, and had the right to control them.

Among the points made in this court for reversal, the decree for the correction of the deed from Hunter to Tinsley, is very much relied on as a fatal error. The objections are that there was no evidence to show that it was a mistake, and none to show in what the mistake consisted, and that all relief of that kind was barred by the statute of limitations, the deed having been made in 1852, seventeen years before the institution of this action. The mistakes in this deed were

2. REFORMATION OF DEEDS F O R MISTAKE O N THEIR FACE.

not of a character which needed parol evidence to indicate. They were blunders of the scrivener, apparent on the face of the instrument. The seal was omitted, though purporting to be under seal, and the words "grant, bargain and sell," or their equivalents, were omitted, although there were words of warranty. It is not a case where there was a misdescription of the land, or the omission of anything which parol testimony could supply. The mistakes are apparent. *Wadsworth v. Wendell*, 5 John. Ch. 224.

It is not easy to see upon what principle it is that the plaintiffs invoke the statute of limitations to bar the correction of these mistakes in the deed. The defendants, who are purchasers for value, directly or indirectly, from Tinsley, have never been disturbed in their possession. No eviction has occurred—nothing, in short, requiring any affirmative action on their part, till the institution of this suit, against those who then, for the first time, discover the defects or omissions in the trustee's deed. They are, in our opinion, clearly entitled to have the deed corrected, unless, as is assumed as the basis of all argument to the contrary, it was concluded, by the court, that the sale from Hunter to Tinsley was the result of a fraudulent conspiracy. But the circuit court found that there was no such conspiracy or fraud, and we concur in this finding. The defendants were then entitled to have the deed corrected. *Bartlett v. Judd*, 23 Barb. 270 ; *Mastin v. Halley*, 61 Mo. 198.

As to the plea of the statute of limitations on behalf of defendants, we deem it unnecessary, although the court also found for defendants on that plea. The plaintiffs are the party who come into court and ask affirmative relief, and their case wholly depends on the establishment of two assertions ; one, that their ancestor was the owner, legal and equitable, of the land in question, and the other, that the sale by the trustee in 1852 was a fraudulent one. They failed to prove either. The plaintiffs must first make out a case. The defendants have been in possession, paid high

29 –69

prices for the land, have made lasting and valuable improvements. That they were without notice of any fraud is clear, since, in fact, there was no fraud for them to have any notice of. The plea of the statute of limitations was, therefore, unnecessary, and whether it was rightly sustained or not, cannot affect the decree. The judgment of the circuit court is affirmed. The other judges concur.

AFFIRMED.